UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ANGELITA FLOYD, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:22-CV-1131-B |
| | § | |
| STRYKER CORPORATION, | § | |
| | § | |
| Defendant. | § | |

### MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff Angelita Floyd's Motion for Certification of a Collective and Notice (Doc. 33). For the reasons explained below, the Court **GRANTS in part** and **DENIES in part** the Motion.

### I.

### BACKGROUND

This is a Fair Labor Standards Act ("FLSA") case arising out of Floyd's employment with Defendant Stryker Corporation ("Stryker"). Floyd brings this lawsuit on behalf of herself and all others similarly situated, alleging that she and other Stryker employees "engage[d] in off-the-clock . . . work or time worked that was not recorded and not compensated." Doc. 34, Pl.'s Br. Mot., 1. Ten other putative collective members (the "opt-ins") have joined this lawsuit since Floyd filed the initial complaint. *Id.*

Stryker is a "medical technologies corporation based in Kalamazoo, Michigan." *Id.* In 2020, Stryker "created a customer service department in Flower Mound, Texas." *Id.* Floyd and all other potential collective members worked at the Flower Mound facility as either Customer Service Senior Team Members or Customer Service Team Members ("CSRs"). *Id.* at 1–2. The CSRs were

assigned to one of five teams that served different geographical regions. Doc. 38, Def.'s App'x, 2–3. From January 2020 through September 2021, each CSR was assigned to one of five regions: (1) Northeast; (2) Rocky Mountain; (3) Southeast; (4) Southwest; and (5) West. *Id.* In Fall of 2021, Stryker reorganized the department into five branches, which were also divided geographically. *Id.* at 3. Each region, or branch, had one team lead who supervised their region's CSRs. Doc. 35, Pl.'s App'x, 313–14. The CSRs reported to their region's team lead, and each team lead reported to the Director of Customer Relations, Richard Francis. *Id.* at 314–15.

The CSRs' primary job responsibilities were to "fulfill[] customer orders," meaning that the CSRs processed the customer orders assigned to them. Doc. 34, Pl.'s Br. Mot., 3. Senior CSRs had additional job responsibilities, such as training junior CSRs, attending additional meetings, and processing credits for their teams. *See* Doc. 38, Def.'s App'x, 1095—97, 1111, 1120. Nevertheless, Richard Francis testified that senior CSRs and non-senior CSRs generally had the same job responsibilities. Doc. 35, Pl.'s App'x, 315.

The CSRs were paid hourly and used a software to enter their time. Doc. 35, Pl.'s App'x, 320. Team leads reviewed the CSRs' time entries for accuracy by comparing the timesheets with emails, Microsoft Teams messages, and the timestamps from the CSRs' processed orders. *Id.* at 322. Every CSR was scheduled to work forty hours a week and to only work Monday through Friday. *Id.* at 319. The CSRs would receive customer orders both during their shift and after their shifts ended. Doc. 35, Pl.'s App'x, 318. They were required to process any after-hours orders before 10:00 a.m. the following day. *Id.* Stryker reprimanded and threatened to place CSRs on a performance improvement plan if they failed to process their assigned orders on time. Doc. 35, Pl.'s App'x, 10–12, 48–50, 79–80. Floyd and the opt-ins claim that they needed to work more than forty hours a week to ensure they processed all their orders. Doc. 34, Pl.'s Br. Mot., 4 (citing Doc. 36, Pl.'s

App'x).

Importantly, there are some distinctions between the opt-ins' deposition testimony. For example, some opt-ins testified that they were never told by their supervisors to work off-the-clock, while others said they were told to work off-the-clock. Doc. 38, Def.'s App'x, 1037, 1067–68, 1076–77, 1079, 1098, 1131–32, 1151–52. Some opt-in plaintiffs testified that their supervisors either changed the hours they entered or told the opt-ins to change their hours. *Id.* at 1088–89, 1102–04, 1130, 1134. Other opt-in plaintiffs, including Floyd, were never told to change their hours and never had their hours altered. *Id.* at 1065, 1076–77, 1143. Additionally, some of the opt-ins informed their supervisors that they were working off-the-clock. *Id.* at 1133, 1153. Others, in contrast, never told their supervisors they worked off-the-clock. *Id.* at 1080–81, 1116–17.

Floyd seeks to certify the following collective:

> All persons employed by Defendant Stryker Corporation at its Flower Mound, Texas Facility as Senior Team Members, Customer Service, and Team Members, Customer Service who worked at any time from March 1, 2020, to present and were not compensated one and a half times their regular hourly rate for all hours worked in excess of 40 hours per workweek.

Doc. 34, Pl.'s Br. Mot., 1.

## II.

## LEGAL STANDARD

The FLSA permits plaintiffs to bring lawsuits on behalf of themselves and "other employees similarly situated." 29 U.S.C. § 216(b). However, the FLSA does not define the term "similarly situated" or otherwise provide any guidance on how courts can determine whether employees are similarly situated. *Swales v. KLLM Transp. Servs., L.L.C.*, 985 F.3d 430, 433 (5th Cir. 2021). In the absence of a statutory definition, federal courts developed an approach to determine whether a potential collective is similarly situated. *Id.* at 435.

Under this approach, courts consider "all facts and legal considerations material to determining such status," *Klick v. Cenikor Found.*, 79 F.4th 433, 442 (5th Cir. 2023) (citation omitted), and "whether merits questions can be answered collectively." *Swales*, 985 F.3d at 442. In other words, the Court must determine whether the evidence needed to resolve the merits questions can "be applied on a collective basis." *Swales*, 985 F.3d at 442. "A showing that members of a collective action are similarly situated does not require members to be identically situated, but requires plaintiffs to show a demonstrated similarity between the purported collective, such as a factual nexus that binds the claims together so that hearing all claims in one proceeding is fair to all parties and not beset with individual inquiries." *Klick*, 79 F.4th at 442 (citation omitted). If the Court determines that the named plaintiff and the purported collective members are similarly situated, the Court will then authorize notifying the potential opt-in plaintiffs. *Id.*

### III.

### ANALYSIS

Three factors guide district courts in determining whether the members of the proposed collective are similarly situated: (1) the potential collective members' factual and employment settings; (2) any defenses available to defendants that are individual to each potential collective member; and (3) fairness and procedural considerations. *Torres v. Chambers Protective Servs.*, No. 5:20-CV-212-H, 2021 WL 3419705, at *3 (N.D. Tex. Aug. 5, 2021) (Hendrix, J.) (citation omitted). The Court finds that all three of these factors weigh in favor of certifying the collective.

A.  *Factual and Employment Settings Favor Certification*

Under the first factor, courts compare "job duties, geographic locations, supervision, and salary" to evaluate whether members of the potential collective are similarly situated. *Id.* at 5 (citation omitted). "The presence of a common policy, plan, or practice affecting all putative class

members, although not required, can be helpful in assessing the first factor." *Id.* (quoting *Vanzzini v. Action Meat Distributors, Inc.*, 995 F. Supp. 2d 703, 721 (S.D. Tex. 2014)). Differences among the putative collective members only weigh against certification if "FLSA liability turns on the identified differences." *Id.* (citation omitted). The Court finds that the Plaintiffs' factual and employment settings favor certification.

### 1. Job Duties

The job duties of the proposed collective weigh in favor of certification. As discussed above, every CSR's primary job responsibility was to process their assigned customer orders and the CSRs had "strict deadlines for these orders." Doc. 34, Pl.'s Br. Mot., 3. The Fifth Circuit affirmed a district court's finding that employees with similar productivity requirements who claimed they had to work off-the-clock to meet these requirements were similarly situated. *See Loy v. Rehab Synergies, L.L.C.*, 71 F.4th 329, 338–39 (5th Cir. 2023). The CSRs here likewise claim they needed to work off-the-clock to meet Stryker's deadlines for processing their orders. Doc. 35, Pl.'s App'x, 10–12, 48–50, 79–80. CSRs faced potential discipline from their team leads if they failed to meet said deadlines. *Id.* Thus, the CSRs were all subject to similar performance requirements like the plaintiffs in *Loy*. *See Loy*, 71 F.4th at 334.

Stryker argues this aspect weighs against certifying the collective because senior CSRs and non-senior CSRs had different job duties. *See* Doc. 37, Resp., 17. Specifically, the senior CSRs had additional job responsibilities such as training new CSRs, attending meetings, and processing credits for their team. *See* Doc. 38, Def.'s App'x, 1095—97, 1111, 1120. However, Floyd is not required to show the CSRs are "identically situated"—instead, Floyd must "show a demonstrated similarity between the purported collective." *See Klick*, 79 F.4th at 442. Moreover, Richard Francis, the Stryker employee who oversaw all the CSRs, testified that non-senior and senior CSRs

"essentially" had the same job duties. Doc. 35, Pl.'s App'x, 315.

Ultimately, Stryker's potential liability under the FLSA does not turn on senior CSRs having additional supervisory responsibilities. *See Torres*, 2021 WL 3419705, at *5 (finding that the opt-ins had similar job duties "regardless of whether they were supervisors"). Because both groups of CSRs primarily fulfilled customer orders and their ultimate supervisor, Richard Francis, acknowledged both groups "essentially" had the same responsibilities, any additional supervisory responsibilities held by the senior CSRs are insufficient to support a finding that the opt-ins are not similarly situated. *See id.* Therefore, the CSRs' job duties weigh in favor of certifying the collective.

### 2. Geographic Location

The CSRs' geographic location weighs in favor of certifying the collective because every potential collective member worked at the same Flower Mound customer service center. Stryker argues that the first factor weighs against certification because the CSRs were assigned to different teams that each served a different geographical region. Doc. 37, Def.'s Resp., 17–18. However, what matters is where the members of the collective performed their duties and whether any difference in location precludes resolving the case collectively. *See Clark v. Centene Co. of Tex., L.P.*, 44 F. Supp. 3d 674, 688 (W.D. Tex. 2014) (rejecting defendants' arguments against certification where plaintiffs worked at different hospitals in different cities), *aff'd*, 656 F. App'x 688 (5th Cir. 2016). Here, the CSRs all worked at the same location, so there is no difference in geographic location which would preclude this case from proceeding collectively. Therefore, the CSRs' geographic location weighs in favor of certifying the collective.

### 3. Supervision

Similarities between how the CSRs were supervised also suggest the Court should certify the collective. The CSRs at the Flower Mound facility reported directly to their respective

supervisor or "team lead." Doc. 38, Def.'s App'x, 2–3. Floyd and the ten opt-ins had eight different team leads between themselves, and every team lead reported directly to Richard Francis. *See id*; *see* Doc. 37, Resp., 21; Doc. 35, Pl.'s App'x, 313. Richard Francis also met with the team leads daily to discuss "any issues that might be occurring." Doc. 35, Pl's. App'x, 314.

Stryker's company policy requires employees to first request permission before working overtime. Doc. 38, Def.'s App'x, 8. Additionally, to ensure the CSRs entered accurate hours, every Stryker team lead was required to review the CSRs' hours by comparing the CSRs' timesheets with their emails, Microsoft Teams messages, and the time stamps from the orders they processed. Doc. 35, Pl.'s App'x, 322. Therefore, each CSR was subject to the same supervisory policies—they needed to ask for their team lead's permission before working overtime, and each team lead was required to review the CSRs' timesheets for accuracy.

Stryker argues that the CSRs' team leads had different practices regarding overtime. Doc. 37, Resp., 19. For example, Stryker points to evidence that some team leads would usually approve overtime requests, while others would occasionally deny requests to work overtime. Doc. 38, Def.'s App'x, 1112–13, 1166–67, 1172. However, the Court is not convinced that this evidence establishes the team leads had notably different practices regarding overtime or off-the-clock work. Instead, this evidence simply shows that the team leads would exercise their discretion when the CSRs requested to work overtime, which is not inconsistent with Stryker's overtime policy that applied to every CSR. The distinctions identified by Stryker—i.e., some team leads being more likely to approve overtime hours than others—are therefore insufficient to show the CSRs' supervision weighs against certifying the collective.

### 4. Salary

Fourth, the CSRs' salaries also suggest certification is appropriate. The CSRs were paid

hourly, and each CSR worked forty hours a week from Monday through Friday, excluding overtime. Doc. 35, Pl.'s App'x, 319–22. The CSRs appear to have all been paid approximately $20 per hour. Doc. 34, Pl.'s Br. Mot., 3. The salaries of the potential collective members, therefore, also cut in favor of certifying Floyd's proposed collective.

In sum, the factual and employment settings factor weighs in favor of certifying Floyd's proposed collective because the CSRs had the same job duties, worked in the same location, worked the same hours for the same hourly wage, and were subject to similar supervisory policies and practices.

B.   *The Lack of Defenses That Are Individual to Plaintiffs Favors Certifying the Collective*

The lack of individualized defenses further suggests that the Court should certify the collective. Stryker does not offer any affirmative defenses that would only apply to some of the CSRs—instead, it argues the defenses factor weighs against certification because of a "disparity and lack of consistency amongst the Plaintiffs' claims." Doc. 37, Resp., 19–20. Specifically, Stryker contends that the proof required to rebut claims that "Plaintiffs were told to alter their time records . . . is vastly different from the proof required to rebut the claims of other opt-ins that . . . Stryker knew or should have known that they worked off the clock." *Id.* at 19. While courts usually consider affirmative defenses when assessing this factor, *see, e.g., Clarke v. Pei Wei Asian Dinner LLC*, No. 3:20-CV-0800-N, 2023 WL 2518805, at *4 (N.D. Tex. Mar. 13, 2023) (Godbey, C.J.), the Court will also consider here whether any of Stryker's arguments regarding "disparate proof" render the CSRs' claims so individualized that they cannot proceed collectively. The Court finds Stryker's arguments unconvincing.

The only distinction offered by Stryker that cuts against certifying the collective is that some opt-ins testified that they told their team leads they could not complete all of their assigned

work in forty hours, while others did not. Doc. 38, Def.'s App'x, 1080–81, 1116–17 (testifying that they never notified their team leads they were working off-the-clock); Doc. 38, Def.'s App'x, 1133, 1153 (testifying that they notified their team leads they were working off-the-clock). When bringing an unpaid overtime claim, plaintiffs are required to show the employer "had knowledge, actual or constructive, that [the plaintiff] was working." *Loy*, 71 F.4th at 337 (quotation omitted). So, the Court needs to assess whether the question of if Stryker had actual or constructive knowledge of the plaintiffs' off-the-clock work can be answered collectively.

The Court ultimately cannot assess whether Stryker had knowledge of off-the-clock work regarding both groups of CSRs collectively—those who notified their team leads they worked off-the-clock and those who did not. However, that does not necessarily mean the opt-ins' claims are too individualized to be resolved in a collective action. In *Torres*, the court divided the putative collective into two subgroups—supervisors and non-supervisors—to apply the economic-realities test and found that, under this approach, the claims "[were] not sufficiently individualized to prevent an effective collective action." *Torres*, 2021 WL 3419705 at *9.

Here, the Court can likewise split the collective into two subgroups for the purpose of assessing Stryker's knowledge regarding off-the-clock work: (1) the employees who notified their team leads they were engaging in off-the-clock work and (2) the employees who did not notify their team leads they were engaging in off-the-clock work. Split in this manner, the Court finds that the question of Stryker's knowledge is not too individualized because the Court can assess Stryker's knowledge "collectively within these subgroups." *See Torres*, 2021 WL 3419705, at *9.

Stryker also argues that because that many of the opt-ins worked overtime and were compensated for working overtime, the collective's claims are individualized. Doc. 37, Resp., 3–5. According to Stryker's records, the opt-ins worked varying amounts of overtime. *Id.* This line of

argument, however, goes to damages, and courts have held that collective members having different amounts of damages does not weigh against certification where the amount of damages is not relevant to assessing liability. *Roberts v. Baptist Healthcare Sys., LLC*, No. 1:20-CV-00092-MAC, 2022 WL 4089819, at *11 (E.D. Tex. Aug. 9, 2022), *report and recommendation adopted*, 2022 WL 4084420 (E.D. Tex. Sept. 4, 2022); *Maynor v. Dow Chem. Co.*, 671 F. Supp. 2d 902, 935 (S.D. Tex. 2009) ("The need for individual plaintiffs to establish the amount of uncompensated time does not defeat certification."). Therefore, the fact that Stryker paid many of the opt-ins overtime and did so in differing amounts does not affect the outcome of this Motion.

In sum, Stryker offered no affirmative defenses that were individual to some of the CSRs and the question of whether Stryker had knowledge of the off-the-clock work is not too individualized to prevent the case from proceeding collectively. Therefore, the Court finds that the defenses available to Stryker factor also weighs in favor of certification.

C.  *Fairness and Procedural Considerations Favor Certifying the Collective*

The fairness and procedural considerations factor also cuts in favor of certifying the collective. In analyzing this factor, "courts consider the primary objectives of FLSA collective actions – (1) to lower costs to the plaintiffs through the pooling of resources, and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arise from the same alleged activity." *Segovia v. Fuelco Energy L.L.C.*, No. SA-17-CV-1246-JKP, 2021 WL 2187956, at *11 (W.D. Tex. May 28, 2021) (internal quotations omitted). "Courts also consider whether the case can be coherently managed in a manner that will not prejudice any party." *Francis-Luster v. Kelley L. Firm, P.C.*, No. 3:19-CV-2708-L-BK, 2022 WL 822468, at *4 (N.D. Tex. Feb. 10, 2022) (Toliver, M.J.), *report and recommendation adopted*, No. 3:19-CV-2708-L-BK, 2022 WL 575566 (N.D. Tex. Feb. 25, 2022) (Lindsay, J.)

Here, the Court finds that this case would be more efficiently resolved by proceeding collectively. A collective action would lower Floyd and the opt-ins' costs and allow the Court to decide the common issues of law and fact in a single proceeding. *See Segovia*, 2021 WL 2187956, at *11. While the Court must split the collective into two subgroups to determine Stryker's knowledge of off-the-clock work, the Court can still manage this case in a "coherent[] . . . manner that will not prejudice any party." *See id.* Accordingly, the fairness and procedural considerations factor also weighs in favor of certifying the collective.

D.      *The Court Declines to Equitably Toll the Statute of Limitations*

In addition to certifying the collective, Floyd and the opt-ins also move for the Court to equitably toll the statute of limitations from November 1, 2022, through April 3, 2023. Doc. 34, Pl.'s Br. Mot., 21–22. The Court denies Floyd's request for equitable tolling.

Courts only equitably toll statutes of limitations "in rare and exceptional circumstances." *Teemac v. Henderson*, 298 F.3d 452, 457 (5th Cir. 2002) (citation omitted). In FLSA cases, a plaintiff that seeks to equitably toll the statute of limitations must show "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Sandoz v. Cingular Wireless, L.L.C.*, 700 F. App'x 317, 320 (5th Cir. 2017) (quoting *Menominee Indian Tribe of Wis. v. United States*, 577 U.S. 250, 255 (2016)). An extraordinary circumstance requires an "external obstacle to timely filing." *Id.* (citation omitted). But, as relevant here, "[d]elays in granting a collective do not present extraordinary circumstances justifying equitable tolling." *Roberts*, 2022 WL 4493733 at *3.

Floyd argues that the Court should equitably toll the statute of limitations for the putative collective members because *Swales* now requires plaintiffs to engage in "collective discovery before filing a motion for certification." Doc. 34, Pl.'s Br. Mot., 22. Floyd cites *Gomez v. Global Precision*

-11-

*Systems, LLC*, 636 F. Supp. 3d 746, 760 (W.D. Tex. 2022), where the court equitably tolled the statute of limitations, in part, because of "delays in the Court deciding the present Motion and delays inherent in the *Swales* process." However, the Court is not convinced and finds that any delay in a court deciding a motion to certify a collective is not an extraordinary circumstance justifying equitable tolling. *See Roberts*, 2022 WL 4493733 at *3.

Aside from these delays, Floyd offers no other extraordinary circumstances or "external obstacle to timely filing" to justify her request to equitably toll the FLSA's statute of limitations. Therefore, the Court concludes that Floyd and the current opt-ins have not met their burden of showing that extraordinary circumstances prevented other potential opt-ins from joining in this action or filing individual suits.

E.   *The Court Narrows the Proposed Collective*

Floyd proposes a collective that includes all CSRs dating back to March 1, 2020. However, this would potentially result in providing notice to some CSRs whose claims would be barred by the FLSA's statute of limitations. To avoid this, the Court will only authorize notice to the CSRs who worked for Stryker within the FLSA's statute of limitations. *See Torres*, 2021 WL 3419705, at *12 (narrowing the plaintiffs' collective to only include employees whose claims would not be barred by the FLSA's statute of limitations).

The FLSA generally provides a two-year statute of limitations, except willful violations are subject to a three-year statute of limitations. 29 U.S.C. § 255(a). "A willful violation occurs when 'the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited.'" *Dacar v. Saybolt, L.P.*, 914 F.3d 917, 926 (5th Cir. 2018) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)). Floyd alleges that Stryker willfully violated the FLSA, which, if true, would mean the CSRs' FLSA claims are subject to a statute of limitations of three

years. Doc. 1, Compl., ¶ 38; *see* 29 U.S.C. § 255(a).

The Court finds that this case warrants providing notice to all CSRs that would fall within the longer three-year statute of limitations period. Here, Floyd has presented evidence from Stryker's employee handbook that Stryker knew about its FLSA obligations to pay the CSRs for all hours worked. Doc. 38, Def.'s App'x, 8 ("Except where different standards are required by the law of the state in which you work, overtime will be paid for all hours worked in excess of forty . . . in one workweek."). While the Court is *not* assessing the merits of Floyd's allegations that Stryker willfully violated the FLSA at this stage in the litigation, Floyd has also presented some evidence suggesting Stryker knew it was not compensating at least some CSRs for off-the-clock work. For example, some of the CSRs testified that they notified their team leads they were working off-the-clock. Doc. 38, Def.'s App'x, 1133, 1153. Thus, Floyd did not make a "mere conclusory allegation" of a willful FLSA violation. *See Rojas v. Garda CL Se., Inc.*, 297 F.R.D. 669, 679 (S.D. Fla. 2013) ("[P]laintiffs' allegation of 'willfulness' is not a mere conclusory allegation, and the facts of the case support providing notice based on a limitations period of three years."). Accordingly, the Court finds it proper to provide notice to all CSRs who worked for Stryker in the three years predating this Order.

The Court, therefore, narrows the collective to only include the CSRs that would fall within the three-year statute of limitations period for willful FLSA violations. *See Torres*, 2021 WL 3419705, at *12; *see Wesley v. Experian Info. Sols., Inc.*, No. 4:18-CV-00005, 2018 WL 3105763, at *3 (E.D. Tex. June 25, 2018) (authorizing providing notice "within the longer three-year statute of limitations.").

Accordingly, the Court certifies the following collective:

All persons employed by Defendant Stryker Corporation at its Flower Mound, Texas

        Facility as "Senior Team Members, Customer Service," and "Team Members, Customer Service" who worked at any time from **January 2, 2021,** to present and were not compensated one and a half times their regular hourly rate for all hours worked in excess of 40 hours per workweek.

F.    *The Court Authorizes a Sixty-Day Notice Period*

Floyd's proposed method of notice is by U.S. First-Class Mail and email. Doc. 34, Pl.'s Br. Mot., 24. The Court grants this request as it proposes routine, reasonable modes of notifying members of the collective. *See, e.g., Jones v. JGC Dallas LLC*, No. 3:11-CV-2743-O, 2012 WL 6928101, at *5 (N.D. Tex. Nov. 29, 2012) (Ramirez, M.J.), *report and recommendation adopted*, No. 3:11-CV-2743-O, 2013 WL 271665 (N.D. Tex. Jan. 23, 2013) (O'Connor, J.).

Floyd also requests a notice period of ninety days—so, any potential member would have 90 days to join the collective after receiving notice. Doc. 34, Pl.'s Br. Mot., 24. "[M]ost courts appear to default to a notice period of sixty days, unless potential plaintiffs are difficult to contact because of their locations or other extenuating factors warrant additional time." *Thrower v. UniversalPegasus, Int'l Inc.*, 484 F. Supp. 3d 473, 491 (S.D. Tex. 2020). Here, all members of the purported collective worked at the same facility, so it is unlikely that any potential plaintiffs will be difficult to contact. Additionally, Floyd does not raise any extenuating factors warranting a longer notice period. Therefore, the Court sets a notice period of sixty days. *See Thrower*, 484 F. Supp. 3d at 491. Potential plaintiffs will have sixty days to submit a consent form to join this lawsuit. Floyd can also hire a third-party class action administration company if Floyd's counsel considers it appropriate to help with disseminating notice.

The Court instructs Floyd and her counsel to make the necessary updates to the proposed notice as required by this Order and to file the updated notice form with the Court within seven (7) days of this Order.

G.  *The Court Grants Floyd's Request for Discovery*

Lastly, to help facilitate disseminating notice, the Court orders Stryker to provide Floyd with a computer-readable file containing all the names, last known mailing addresses, all known email addresses, and dates of employment for all collective members employed any time from January 2, 2021, to the date of this Order. Stryker must provide Floyd with this file within fourteen (14) days of this Order.

## IV.

## CONCLUSION

For the reasons explained above, the Court **GRANTS in part** and **DENIES in part** Floyd's Motion to Certify a Collective (Doc. 33). Specifically, the Court: **GRANTS** Floyd's request to certify a collective but narrows it to employees who worked for Stryker in the last three years; **DENIES** Floyd's request to toll the statute of limitations; **ORDERS** a 60-day notice period and for Floyd to file an updated notice form with the Court within seven (7) days of this Order; and **ORDERS** Stryker to provide Floyd with a file containing the contact information of all putative class members within fourteen (14) days of this Order.

**SO ORDERED**.

**SIGNED: January 2, 2024.**

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE